IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA BRUNO, | ) | Case No. 1:20-CV-2633 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

## I.      Introduction

Plaintiff, Lisa Bruno, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Bruno challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating the medical opinion evidence, making his findings of Bruno's residual functional capacity, and forming hypothetical questions to the vocational expert.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Bruno's application for DIB be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## II.   Procedural History

On November 5, 2018, Bruno applied for DIB.  (Tr. 146-148).[2]  Bruno alleged that she became disabled on July 6, 2018 due to fibromyalgia, lupus, and arthritis.  (Tr. 166, 170).  The Social Security Administration ("SSA") denied Bruno's claim initially and upon reconsideration.  (Tr. 48-57, 59-70).  Bruno requested an administrative hearing.  (Tr. 93-94).

ALJ George Roscoe heard Bruno's case on February 4, 2020 and denied her claim in a March 19, 2020 decision.  (Tr. 12-23).  At Step Four of the sequential evaluation process, the ALJ determined that Bruno had the residual functional capacity ("RFC") to perform light work, with the following limitations:

> No climbing of ladders, ropes, and scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, frequent handling and fingering; occasional overhead reaching without limitation of lateral reaching; no concentrated exposure to temperature extremes, humidity, or environmental pollutants; and no exposure to hazards (heights, machinery, commercial driving).

(Tr. 16).

Based on vocational expert testimony that a hypothetical individual with Bruno's age, experience, and RFC could perform Bruno's past work and also work such available occupations as collator operator, children's attendant, and order caller, the ALJ determined that Bruno wasn't disabled.  (Tr. 22).  On October 5, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On November 24, 2020, Bruno filed a complaint to obtain judicial review.  ECF Doc. 1.

---

[2] The administrative transcript is available at ECF Doc. 12.

### III.  Evidence

#### A.  Personal, Educational, and Vocational Evidence

Bruno was born on December 16, 1966 and was 51 years old on her alleged onset date. (Tr. 166).  She graduated high school and had one year of college but did not have any specialized job training.  (Tr. 171).  She had previously worked as a loan servicer.  *Id.*

#### B.  Relevant Medical Evidence

Some information pre-dating Bruno's alleged onset date is included as background to her conditions.

On January 28, 2015, Bruno was seen at Marymount Hospital, complaining of abnormal uterine bleeding and reported a history of carpal tunnel surgery, ulnar nerve compression, joint surgeries, and cortisone injections in her left hand for arthritis pain.  (Tr. 273, 275).

On November 16, 2015, Bruno was admitted to Marymount Hospital, complaining of tremors, vertigo, dizziness, nausea, and vomiting.  (Tr. 241, 246).  During her admission process, her hand tremors were noticeable, and Bruno reported that two weeks earlier she underwent a nerve block procedure.  (Tr. 243).  The following day, Bruno reported that she felt better when resting, did not note any tremors, and only had mild dizziness when sitting up in bed.  (Tr. 245). In reviewing her symptoms, Bruno denied apnea, heart palpitations, myalgias, arthralgias, gait problems, and neck stiffness.  (Tr. 248).  On physical examination, Bruno had a normal heart rhythm and sounds and a normal range of motion in her musculoskeletal system.  *Id.*  Bruno also underwent an electrocardiogram ("ECG") that showed that she had a sinus tachycardia but was otherwise normal.  (Tr. 249).  She was discharged in stable condition.  *Id.*

On April 30, 2016, Bruno had hand x-rays taken for left hand swelling.  (Tr. 264).  It showed that neither hand had evidence of fracture, dislocation, or destructive process.  *Id*.  Both hands had exaggerated ulnar tilts of the distal radial metaphysis.  *Id.*

On May 25, 2016, Bruno was admitted to St. Vincent Charity Medical Center, presenting with cervical disc disease.  (Tr. 233).  On August 24, 2016, Bruno had an x-ray of her cervical spine as a follow-up to a recent cervical disc surgery.  (Tr. 268).  The x-ray indicated that she had post-surgical changes including grafts at two-disc spaces with associated post-surgical devices. *Id.*  It also indicated that her prevertebral soft tissues were not prominent, there was no evidence of facture, and her disc heights away from her surgery appeared preserved.  *Id.*  It noted that there was some suggestion of osseous neural foraminal narrowing on her right side and signs of facet arthritis in one disc.  *Id.*

On November 21, 2016, Bruno underwent a left heart catherization.  (Tr. 271).  About one year later, on November 16, 2017, Bruno saw Knodarpur Guruprasad, MD, for a cardiovascular exam.  (Tr. 305).  She reported that she walked on a treadmill for 30 minutes daily.  *Id.*  She denied any chest pain, shortness of breath, orthopnea, leg edema, or palpitations. (Tr. 306).  On physical examination, her blood pressure was 120/80, and she was observed to not be in acute distress; with no wheezing or peripheral edema; and to have a normal heart rhythm. (Tr. 308).  Bruno was assessed with coronary artery disease ("CAD"), which was stable and angina free, and dyslipidemia.  *Id.*  She also underwent an ECG, which showed that her heart had a normal sinus rhythm.  (Tr. 314).

On April 24, 2018, Bruno had an appointment at Parma Medical Associates with Ogechi Muoh, DO.  (Tr. 288).  She reported a history of cutaneous lupus and fibromyalgia and came for an evaluation.  *Id.*  She also reported issues with her triggering middle finger on her left hand.

*Id.*  Specifically, she reported joint pain in the metacarpophalangeal joint ("MCP") area of the triggering finger, left hand numbness, tingling, and weakness.  *Id.*  In reviewing her symptoms, Bruno denied morning stiffness, chest pain, shortness of breath, fatigue, chronic back pain, but did report numbness, tingling, and weakness in her left hand.  *Id.*  On physical examination, Bruno's cardiovascular system was noted as having a regular heart rate, rhythm, and sounds; she did not wheeze; and her extremities were noted as not having any edema, cyanosis, or clubbing but she did have slightly diminished pulses.  (Tr. 289).  Her neck, shoulders, and elbows were all within normal limits and range of motion; and, as to her wrists and fingers, she had no active synovitis, had a good fist and grip but seemed to hold her left middle finger over her index finger.  *Id.*  She also had full range of motion and was within normal limits in her knees, hips, ankles, and feet.  *Id.*  Neurologically, she had normal deep tendon reflexes in all her extremities, normal strength, intact sensation, and a normal gait.  *Id.*

On April 24, 2018, Bruno also had an x-ray of her left hand.  (Tr. 290).  The x-ray indicated that her bony structures were intact, there was a narrowing at the third MCP joint indicating early degenerative change; and her soft tissues were unremarkable without significant edema or radiodense foreign bodies.  *Id.*

On May 9, 2018, Bruno had an appointment at Parma Medical Associates, complaining of left hand and shoulder pain.  (Tr. 285).  She was noted as having arthropathy, lupus, and fibromyalgia as active problems.  *Id.*  She also reported issues with triggering middle finger on her left hand.  *Id.*  She noted that she had previously received an injection for the finger and was interested in having another.  *Id.*  On physical examination, her neck, shoulders, and elbows were within normal limits with a full range of motion; no effusion or active synovitis was noted in her wrist and fingers; and she had normal deep tendon reflexes, strength, sensation, and gait.

5

(Tr. 286).  Bruno "seemed to hold [her] left middle finger over index finger," and she had a full range of motion in her wrist.  *Id.*  She was given an injection in the middle finger tendon sheath on her left hand.  *Id.*  Bruno was diagnosed with fibromyalgia and trigger middle finger. (Tr. 287).  She was also instructed on other options for treating her trigger finger, including injections and anti-inflammatory gel, and was given an orthopedic referral.  *Id.*

On May 16, 2018, Bruno saw Dr. Guruprasad, for a six-month cardiology follow-up. (Tr. 316).  She reported having "intermittent left and pressure like pain."  *Id.*  She also reported walking on the treadmill daily without any chest discomfort and not having chest pain, shortness of breath, orthopnea, leg edema, or palpitations.  (Tr. 317).  On physical examination, Bruno was noted as not being in acute distress; her lungs were clear; she was not wheezing; her heart had a regular rhythm; and her extremities did not have any peripheral edema.  (Tr. 319).  She was assessed with CAD and dyslipidemia.  *Id.*  She underwent another ECG, which showed that she was in sinus rhythm with "short pr," but was otherwise normal.  (Tr. 325).

On June 12, 2018, Bruno began seeing Seth Levine, MD, as her primary care physician. (Tr. 350).  She reported her history of fibromyalgia and chronic back pain and indicated that her primary issue was uncontrolled pain and arthralgias diffused bilaterally in her shoulders, back, and hips.  *Id.*  She denied paresthesia, joint swelling, or redness.  *Id.*  In a review of her symptoms, she denied fatigue, constrictive pericarditis, orthopnea, leg edema, heart palpitations, short of breath, dyspnea with exertion, wheezing, myalgia, joint swelling, or gait imbalance. (Tr. 351).  She did report diffuse joint pain.  *Id.*  On physical examination, no physical abnormalities were noted, and she had 5/5 strength in her upper extremities and left arm with full range of motion, a slightly diminished pulse bilaterally in her lower extremities, 2/4 in her

reflexes, and was able to walk unassisted.  (Tr. 353).  She was diagnosed with fibromyalgia and arthropathy.  *Id.*

On August 21, 2018, Bruno saw Dr. Levine, complaining about a rash on her face. (Tr. 343).  In reviewing her symptoms, Bruno denied fatigue, constrictive pericarditis, orthopnea, leg edema, heart palpitations, shortness of breath, dyspnea with exertions, wheezing, arthralgia, myalgia, and joint swelling.  (Tr. 344).  She reported having diffused joint pain.  *Id.*  Her physical examination results were generally the same as her previous visit.  (Tr. 347).

On October 19, 2018, Bruno again saw Dr. Levine.  (Tr. 336).  She reported having a history of diffuse chronic joint pain but denied joint swelling or redness.  *Id.*  In a review of her symptoms, Bruno denied fatigue, leg edema, heart palpitations, orthopnea, shortness of breath, wheezing, diffuse arthralgias, denied myalgia, joint swelling, and gait imbalance.  (Tr. 337).  Her physical exam results were unchanged.  (Tr. 340).  Dr. Levine suspected fibromyalgia to be the cause of Bruno's joint pain.  *Id.*

In December 2018, Bruno saw J. Britten Shroyar, MD.  (Tr. 329, 332).  Bruno stated that her left middle finger would overlap with her ring finger and she would get associated pain in the webspace between her fingers and swelling.  (Tr. 329).  She said that the symptoms worsened when she was typing.  *Id*.  In reviewing her symptoms, Bruno did not report any chest pain, shortness of breath, cough, or muscle weakness.  *Id.*  On physical exam, Bruno was reported as not being in acute distress, having a normal gait, her sensations being intact, and her left "long finger" was swollen along the MCP joint but had no triggering or redness.  (Tr. 330).  Bruno was diagnosed with hand arthritis and was given a referral to an orthopedist.  (Tr. 331).

On January 18, 2019, Bruno saw Dr. Levine, following her arthroplasty reconstruction of her left third MCP.  (Tr. 399).  She reported having worsening right arm/back pain with

numbness and tingling, and denied joint trauma, swelling, and redness.  *Id.*  She also had pain, numbness, tingling, and decreased muscle strength.  *Id.*  She reported that the pain got better with rest, was worse with exertion, and was occasionally sharp.  *Id.*  In a review of her symptoms, she denied orthopnea, leg edema, heart palpitations, shortness of breath, dyspnea with exertion, had right shoulder pain, trauma, arthralgia, myalgia, joint trauma, swelling, or redness, gain imbalance, but reported diffuse joint pain and decreased range of motion.  (Tr. 400).  On physical examination, she was noted as not having a heart murmur, chest deformity, tenderness, or palpation; having 4/5 grip strength on her right hand; having 5/5 strength in her extremities; and having a full range of motion in her extremities.  (Tr. 402).  She also was observed to have a slightly diminished pulse bilaterally in her lower extremities and she had a negative drop arm test.  *Id.*  Her reflexes were grossly intact, and she could walk unassisted.  *Id.*

On March 21, 2019, Bruno saw Dr. Levine for a follow-up appointment on her diffuse chronic joint pain.  (Tr. 423).  She reported having worsening right arm and back pain with numbness and tingling.  *Id.*  She denied joint trauma, swelling, and redness, but had pain, numbness, and tingling.  *Id.*  In a review of her symptoms, she denied fatigue, leg edema, shortness of breath, and joint trauma or swelling.  (Tr. 424).  She reported having decreased grip strength in her left hand, diffuse joint pain, and decreased range of motion.  *Id.*  On physical examination, she had a regular heart rate and rhythm; no deformity, tenderness, or palpitation in her chest; decreased 4/5 grip strength in her left hand; no edemas; and 5/5 strength otherwise in her upper and lower extremities, with full range of motion.  (Tr. 426).  Dr. Levine noted that her right arm/back pain and shoulder pain was suspected cervical radiculopathy versus a rotator cuff tear.  (Tr. 427).

On June 27, 2019, Bruno saw Dr. Levine.  (Tr. 434).  In a review of her symptoms, she denied fatigue, leg edema, shortness of breath, dyspnea with exertion, wheezing, arthralgia, myalgia, and joint swelling.  (Tr. 435).  But she reported decreased grip strength in her left hand due to pain from recent right shoulder surgery, diffuse joint pain, and decreased range of motion. *Id.*  She denied having trauma, arthralgia, myalgia, joint swelling, and gait imbalance.  *Id.*  Her physical examination results were generally the same.  (Tr. 437-438).  Dr. Levine noted that her left-hand pain and MCP third subluxation from her trigger finger improved at present, as well as her right arm/back pain.  (Tr. 438).

On September 26, 2019, Bruno saw Dr. Levine, complaining of 5/10 pain in her left MCP.  (Tr. 451).  She reported that her knuckle felt tight and sore.  *Id.*  In a review of her symptoms, Bruno reported generalized fatigue, diffuse arthralgias pain, increased fibromyalgia pain, soreness of left middle MCP joint, but denied orthopnea, leg edema, shortness of breath, dyspnea with exertion, joint swelling, and gait imbalance.  (Tr. 452).  Her physical exam results were generally the same as before.  (Tr. 454).  She was diagnosed with hyperlipidemia and arthropathy.  (Tr. 455).  Dr. Levine also noted that her left-hand pain and right arm/back pain were improved.  *Id.*

### C.     Relevant Opinion Evidence

#### 1.     Medical Opinion – Seth Levine, MD

On March 21, 2019, Dr. Levine completed an evaluation of Bruno's physical functioning. (Tr. 415-416).  He indicated that Bruno could not lift or carry any weight and had 4/5 hand and grip strength.  (Tr. 415).  Her conditions also affected her ability to stand and walk, and she could only sit for two hours uninterrupted.  *Id.*  She could rarely climb, balance, stoop, crouch, kneel, or crawl.  *Id.*  She could also only rarely reach, push/pull, finely manipulate, or grossly

manipulate.  (Tr. 416).  She also had various environmental limitations and would need to be able to alternate positions when sitting, standing, and walking.  *Id.*  Dr. Levine noted that she had moderate pain that could interfere with her concentration, take her off task, and cause absenteeism.  *Id.*  He also noted that she would need to elevate her leg to 90 degrees and would require additional breaks throughout the day, specifically, an additional four hours.  *Id.*

### 2. Function Report

On November 26, 2018, Bruno completed an SSA function report.  (Tr. 179-186).  She indicated that she lived at home with her spouse and that there were days when she could not get out of bed, type, or where it was very hard to walk.  (Tr. 179).  She stated that her day consisted of her getting up, taking her pills, "trying" to do things around the house, taking a nap, eating, taking her pills, and going to bed.  (Tr. 180).  She did not care for anyone else or any pets.  *Id.*  Her conditions made it so she could no longer lift things, type as long, or be more motivated.  *Id.*  She reported that she was "lucky" to get four to five hours of sleep a night because of her pain.  *Id.*  She did not have any issues with her personal care.  *Id.*

Bruno reported that she prepared her own meals daily, indicating that they were soups, frozen dinners, toast, and "from time to time" complete dinners.  (Tr. 181).  She noted that making dinner took her between five minutes to one hour, and she had experienced a loss of appetite since her condition.  *Id.*  She stated that she cleaned, vacuumed, and dusted about one and a half hours a week about three times a week and did not need encouragement to do so.  *Id.*  She also indicated that she went outside every day, drove or rode in a car, could go out alone, and went grocery shopping once a week for about an hour.  (Tr. 182).  She noted that her husband went grocery shopping with her to carry the bags.  *Id.*

Bruno reported that her hobbies included watching television, going to the park, and doing puzzles.  (Tr. 183).  Since the development of her conditions, she did not do puzzles much because she could not sit for a long time and her shoulder got sore.  *Id.*  She reported that she did not spend time with others but would go to the grocery store and pharmacy and needed someone to go with her.  *Id.*  She indicated that she did not go out because she would get tired.  (Tr. 184).  She reported that her conditions affected her ability to lift, reach, sit, and her memory.  *Id.*  She could walk five to ten minutes before needed to stop and rest, but she could pay attention for a long time.  *Id.*  She used a cane and had glasses; only the glasses were prescribed.  (Tr. 185).  She stated that had had over 100 cortisone shots in her hands, a knuckle replacement, and would become out of breath.  (Tr. 186).

On February 4, 2019, Bruno updated the function report, which largely repeated her prior report.  (Tr. 189-196).  She stated that there were days she could not get out of bed, her lupus affected her face, she could not be at the computer long, and she was in pain all the time. (Tr. 189).  Her daily activities now included taking care of her dog, but on days she could not get out of bed, her husband or daughter would take the dog out.  (Tr. 190).  She could still care for her personal needs and prepare meals but noted that preparing meals "takes time." (Tr. 190-191).  She reported that she vacuumed every other day and cleaned twice a week. (Tr. 191).  She did not do any yard work because it was too hard on her hands and arms. (Tr. 192).  She would go grocery shopping but for the past month her husband had been going. *Id.*  She reported that she did not like crowds anymore, and that her conditions affected her lifting, walking, and concentration.  (Tr. 193).  She was now out-of-breath when walking and could not pay attention like she used to.  *Id.*  She could walk for about three to five minutes

before needing to rest.  *Id.*  Bruno indicated it was getting harder to do her hobbies because her

arm would go numb and was very sore.  (Tr. 194).

### 3.    State Agency Consultants

On December 26, 2018, Dimitri Teague, MD, reviewed Bruno's physical limitations

based on the medical evidence.  (Tr. 55).  He found that Bruno had exertional limitations,

specifically that she could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds,

stand/walk for 6 hours in an 8-hour day, sit for 6 hours in an 8-hour day, was unlimited in her

pushing/pulling abilities, save as identified for lifting or carrying.  (Tr. 54).  He also found that

she could occasionally climb ramps, ladders, ropes, or scaffolds, was unlimited in her balancing,

could occasionally stoop, kneel, crouch, or crawl.  *Id.*  He noted that she did not have any

manipulative limitations.  *Id.*  On reconsideration, Kalpna Desai, MD, found the same limitation,

except that Bruno had manipulation limitations, specifically that she was limited in reaching

right overhead, in her gross manipulation, and was unlimited in her fine manipulation and skin

receptors.  (Tr. 67-68).  Dr. Desai found that Bruno's handling was limited to "occasionally" due

to her right radiculopathy and left-hand pain.  (Tr. 67).  He also found that her overhead reaching

was limited to occasionally due to her right shoulder pain.  *Id.*

### D.    Relevant Testimonial Evidence

Bruno testified at the hearing.  (Tr. 31-37).  She believed that she could not work because

her hands, hips, and shoulders were bad, she had fibromyalgia that made it hard to work, and she

could barely use her hands.  (Tr. 32-33).  She had had a knuckle replacement on her left hand,

two ulnar nerve entrapments on her left hand, tennis elbow surgery, and two ulnar nerve

surgeries on her right hand.  (Tr. 33).  She had discussed returning to work with Dr. Levine

following her last surgery in July 2019, but she decided that because she could not do the things

12

she used to, she should stop.  (Tr. 33-34).  Some of her medication cause her hands to shake.

(Tr. 34).  She believed the heaviest thing she could lift was a gallon of milk, but she had dropped

that in the past.  (Tr. 34-35).  Her husband did most of the chores around the house, but she

would sweep from time to time and dust and would need to sit down after a while because she

would be out of breath.  (Tr. 35).  Her husband did the groceries and the laundry.  *Id.*  After a

while sitting, her hip would bother her and hurt when she stood up.  *Id.*  The pain interfered with

her ability to work at her last job.  (Tr. 35-36).  She also had difficulty walking and would get out

of breath.  *Id.*

## IV.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

is not necessary that this court agree with the Commissioner's findings," so long as it meets this

low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

### B.  Step Four: Weighing of the Physician Opinion Evidence

Bruno argues that the ALJ erred in weighing the physician opinion evidence, resulting in an RFC finding that wasn't supported by the record.  ECF Doc. 13 at 10-12.  Bruno asserts that the ALJ failed to adequately explain why he adopted Dr. Teague's RFC opinion or why it was more persuasive than other, more recent evidence in the record.  ECF Doc. 13 at 10.  Bruno also asserts that the ALJ should not have found Dr. Teague's opinion persuasive because it was

outdated and record evidence from treatment after Dr. Teague issued the opinion showed that her

symptoms had gotten worse.  ECF Doc. 13 at 10.  In contrast, Bruno contends that the ALJ

should have instead relied upon Dr. Levine's and Dr. Desai's opinions regarding her lifting and

manipulative limitations, which were consistent with the record evidence.  ECF Doc. 13

at 11-12.  Because of the ALJ's error in weighing the medical opinions, Bruno contends that the

ALJ's RFC finding should have contained additional manipulative limitations; as a result, she

argues that the ALJ's hypothetical to the VE was incomplete.  ECF Doc. 13 at 12-17.  Because

of that, the VE's responses did not provide substantial evidence for the ALJ to rely on in

determining Bruno not to be disabled.  ECF Doc. 13 at 12-17.  The Commissioner disagrees.

ECF Doc. 14 at 3-7.[3]

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's

RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).

In doing so, the ALJ must "articulate how he considered the medical opinions and prior

administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must

explain how he considered the supportability and consistency of a source's medical opinion(s),

but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).[4]  According

to the regulation, the more consistent a medical opinion is with the evidence from other medical

and nonmedical sources, the more persuasive the medical opinion will be.  This is the

consistency standard.  And the regulation specifies that the more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

---

[3] Although Bruno challenges the VE's testimony as a separate issue, because it is premised on her argument regarding the weighing of the medical opinions, the argument is better construed as a form of harm arising from the alleged error with the ALJ's evaluation of the medical opinions.
[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied the proper standards and reached a decision supported by substantial evidence on evaluating the medical opinion evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Because the adequacy of the ALJ's discussion of the state agency consultants' opinions rests in part on the ALJ's discussion of Dr. Levine, I will discuss the ALJ's evaluation of his opinion first.

The ALJ applied the proper standards in evaluating Dr. Levine's opinion because the ALJ discussed both the opinion's consistency and supportability.  Although not in one tidy paragraph, the ALJ noted Dr. Levine's functional assessment and then, in his evaluation of the medical opinions, identified that the assessment was "not *consistent* with or *supported* by the objective findings in the record."  *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79; (Tr. 20).  The ALJ particularly highlighted Dr. Levine's own treatment notes – from the same day he created the functional assessment – that indicated Bruno had 5/5 strength in her extremities with 4/5 grip strength, full musculoskeletal range of motion, intact reflexes, and a normal gait without the need for an assistance device.  (Tr. 20).  The ALJ reasonably concluded these were inconsistent with – and did not support – Dr. Levine's own assessment that Bruno could rarely perform fine or gross manipulation.  20 C.F.R. § 404.1520c(c)(1); (*see* Tr. 19).  The ALJ also referenced the inconsistency between Dr. Levine's opinion and Bruno's normal ECG results and lack of acute treatment for vertigo or coronary artery disease.  (Tr. 20-21).  The ALJ had a basis for concluding that that such objective evidence was inconsistent with Dr. Levine's proposed exertional limitations.  (*See* Tr. 19).  Based on this discussion, the ALJ properly complied with the requirements of § 404.1520c(c)(1)-(2) in discussing both the extent to which Dr. Levine's

own findings supported his assessment and the extent to which his assessment was consistent with the record.  20 C.F.R. § 404.1520c(c)(1)-(2).

Whether the ALJ's discussion of Drs. Teague's and Desai's opinions was sufficient is a closer question.  However, reading ALJ's discussion as a whole, I conclude that the ALJ addressed both the consistency and supportability for each opinion, albeit intertwining the discussions for both.  Regarding consistency, the ALJ noted that Dr. Teague's and Dr. Desai's opinions were consistent with Bruno's claims of widespread pain and the effects of her coronary artery disease and vertigo.  20 C.F.R. § 404.1520c(c)(2); (Tr. 20).  The ALJ made the additional finding that Dr. Desai's reaching and handling limitations were generally consistent with other objective evidence in the record but noted that because of the consistency of the findings that Bruno had a full range of motion and good strength the ALJ would reduce the limitation from frequent to only occasional.  20 C.F.R. § 404.1520c(c)(2); (Tr. 20).  Additionally, the ALJ's adoption of manipulation limitations, although reduced from Dr. Desai's opinion, also shows the ALJ considered Dr. Teague's opinion; but he found the lack of manipulation limitations in Dr. Teague's opinion to be inconsistent with the medical evidence.  *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.

Regarding supportability, because the state agency consultants did not have their own treatment records by which to judge their opinions, the ALJ must look to the objective medical evidence.  *See* 20 C.F.R. § 404.1520c(c)(1).  Here, that discussion was far from substantial.  But reading the decision as a whole, with common sense, I find that the ALJ adequately discussed the supportability of each opinion.  *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  As to both doctors, the ALJ referenced Bruno's medical records from her (1) November 2015 hospitalization, which included ECG results; (2) left heart catherization; (3) November 16, 2017

17

cardiologist appointment and ECG results; and (4) daily activities.  (Tr. 20-21).  Moreover, in

discussing the consistency of Dr. Desai's manipulation limitations, the ALJ also cited Bruno's

April 24, 2018 hand x-rays.  (Tr. 20).  Just as the ALJ's discussion of the manipulation

limitations applied explicitly to Dr. Desai and implicitly to Dr. Teague, so too did the ALJ's

reference to the x-rays.  Accordingly, the ALJ implicitly showed that Dr. Teague's lack of

manipulation limitations was not supported by the objective medical evidence.

Although the ALJ's discussion of the objective medical evidence in relation to

Drs. Teague's and Desai's opinions is far from substantial, it is not the court's role to re-weigh

the evidence or instruct the ALJ on what evidence to cite.  *Jones*, 336 F.3d at 476.  Because the

ALJ's discussion demonstrates that he considered both the consistency and supportability of each

doctor's opinion, remand is not warranted based on a legal error.

Bruno contends that the ALJ's analysis failed to adequately articulate why the ALJ gave

greater weight to Dr. Teague's opinion than to those of Drs. Desai and Levine.  First, it is

important to note that the ALJ did not state that Dr. Desai's opinion was weighed less than

Dr. Teague's opinion.  (Tr. 20).  Rather the ALJ found them to be generally consistent with each

other (and they were identical but for the manipulation limitations).  *Id.*  Thus, the only opinion

clearly found to be less persuasive was that of Dr. Levine, which the ALJ found to be both

inconsistent with the record evidence and unsupported by Dr. Levine's own treatment notes.  *Id.*

The regulations do not require ALJs to provide a particular level of detail in explaining their

analysis of the medical source evidence.  Rather, the regulation merely states, "[W]e will explain

how we considered the supportability and consistency factors for a medical source's medical

opinions . . . ."  20 C.F.R. § 416.920c(b)(2).  The explanation need not be laid out like geometric

proofs or a Dickens novel.  It need only provide enough reasoning to allow the claimant (and a

reviewing court) to understand the ALJ's thinking.  Further, to assess the adequacy of the explanation, the court reads the ALJ's opinion as a whole and with common sense.  Doing so, I find the ALJ's explanations as to how he evaluated the opinions of Drs. Desai, Levine, and Teague to be sufficient.  The explanation built a logical bridge from the opinions and evidence to the ALJ's conclusion.  *Fleischer*, 774 F. Supp. 2d at 877; *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79 (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Moreover, in the Sixth Circuit, the ALJ may rely on the opinion of a consulting physician who did not have the opportunity to review later-submitted medical records so long as there is "some indication" that the ALJ at least considered the fact that the opinions were outdated before assigning them greater weight.  *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th Cir. 2016) (quotation marks omitted).  Here, the ALJ's discussion of Dr. Desai's manipulation limitations in contrast to Dr. Teague's lack of such limitations demonstrates that the ALJ made that consideration and accounted for the development of the medical evidence in the time between the doctors' reviews.  (Tr. 20).  Further, the ALJ indicated that he based his RFC finding on consideration of the entire record.  (Tr. 14, 16, 21).  Thus, there is at least some indication that the ALJ considered the medical evidence following Dr. Teague's opinion before finding his physical RFC findings persuasive.  *See Spice*, 651 F. App'x at 493-94; *see also Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19-CV-2844, 2020 U.S. Dist. LEXIS 244781, at *33 (N.D. Ohio Dec. 30, 2020); *Jacks v. Comm'r of Soc. Sec.*, No. 3:15-CV-309, 2017 U.S. Dist. LEXIS 19229, at *13-14 (S.D. Ohio Feb. 10, 2017).

Substantial evidence supports the ALJ's weighing of the medical opinions.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Specifically, such evidence includes: (1) Dr. Levine's

treatment notes indicating that Bruno had a full musculoskeletal range of motion, 5/5 in her strength, 4/5 grip strength, normal reflexes, a normal gait; and she consistently denied fatigue, shortness of breath, myalgia, orthopnea, and heart palpitations (Tr. 336-340, 350-353, 399-402, 423-427, 434-438, 451-455); (2) treatment notes indicating Bruno had a normal gait or ambulation (Tr. 289, 305, 317, 330, 347); (3) treatment notes and ECG results indicating her heart functioned normally (Tr. 248-249, 288-289, 308, 314, 325, 344, 347, 424); (4) treatment notes indicating she had good strength and range of motion (Tr. 286, 289, 329, 347); and (5) treatment notes indicating Bruno did not have any active synovitis (Tr. 286, 289). *See Biestek,* 139 S. Ct. at 1154. Additionally, Bruno's own function report indicated that she could take care of her dog, care for herself, prepare meals, and vacuum and clean. (Tr. 190-192).

To the extent Bruno disagrees with the ALJ's weighing of the opinions, such a request asks the court to re-weigh the evidence. This it cannot do. *Jones,* 336 F.3d at 476. Because the ALJ's determinations were supported by substantial evidence, the weight he attributed to the medical opinions fell within his zone of choice. *Mullen,* 800 F.2d at 545. And must be affirmed.

The foregoing analysis obviates the need to engage in a detailed discussion of the contention that the ALJ's RFC was not supported by substantial evidence or that the ALJ's hypothetical question to the VE misstated the limitations demonstrated by the evidence. As to either issue, the finding that the ALJ properly evaluated the medical source opinion evidence also means that substantial evidence supported an RFC that was expressly based on those opinions. And if the RFC was properly supported, then the ALJ's hypothetical questions to the VE were proper. The VE's responses to proper questions provided substantial evidence upon which the ALJ could base his conclusion that Bruno was not disabled under Social Security law.

20

## V.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Bruno's application for DIB be affirmed.

Dated: December 3, 2021

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).